593 So.2d 211 (1992)
Shirley GODWIN, Petitioner,
v.
STATE of Florida, Respondent.
No. 75881.
Supreme Court of Florida.
January 2, 1992.
Rehearing Denied March 3, 1992.
*212 Nancy Daniels, Public Defender and Lynn A. Williams, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for petitioner.
Robert A. Butterworth, Atty. Gen., and Kathleen E. Moore, Asst. Atty. Gen., Tallahassee, for respondent.
HARDING, Judge.
We have for plenary review Godwin v. State, 557 So.2d 955, 956 (Fla. 1st DCA 1990), which certified the following question of great public importance:
WHEN AN INDIVIDUAL SEEKING REVIEW OF AN ORDER OF INVOLUNTARY COMMITMENT HAS BEEN RELEASED FROM THAT COMMITMENT PRIOR TO DISPOSITION OF THE APPEAL ON THE MERITS, WHAT SHOWING MUST SHE MAKE TO AVOID DISMISSAL OF THE APPEAL ON GROUNDS OF MOOTNESS?
We rephrase the question as follows:
Does an appeal from a civil commitment order under The Baker Act, section 394.467, Florida Statutes (1989), become moot solely because the person subject to that order has already been released?
We granted jurisdiction, pursuant to article V, section 3(b)(4) of the Florida Constitution, and answer the question in the negative.
On July 19, 1989, the trial court below ordered Shirley Godwin involuntarily committed to the Florida State Hospital. Godwin filed a notice of appeal attacking her commitment; however, the hospital discharged Godwin before the First District Court of Appeal decided her appeal. The State then moved to dismiss Godwin's appeal on the grounds that Godwin's subsequent release made the appeal of the commitment moot. The First District Court ordered the dismissal, but expressed reservations about this procedure and certified the question to this Court. Godwin, 557 So.2d at 956.
Counsel for the State now calls our attention to the fact that Godwin once again has been involuntarily committed on June 4, 1990, during the pendency of the present review. The State notes that Godwin has not appealed the second commitment. As a result, the State moved the Court to dismiss this appeal on the grounds of mootness. We have denied the State's second motion to dismiss, and answer the rephrased question certified by the First District Court of Appeal.
An issue is moot when the controversy has been so fully resolved that a judicial determination can have no actual effect. Dehoff v. Imeson, 153 Fla. 553, 15 So.2d 258 (1943). A case is "moot" when it presents no actual controversy or when the issues have ceased to exist. Black's Law Dictionary 1008 (6th ed. 1990). A moot case generally will be dismissed.
Florida courts recognize at least three instances in which an otherwise moot case will not be dismissed. The first two were stated in Holly v. Auld, 450 So.2d 217, 218 n. 1 (Fla. 1984), where we said: "[i]t is well settled that mootness does not destroy an appellate court's jurisdiction ... when the questions raised are of great public importance or are likely to recur." Third, an otherwise moot case will not be dismissed if collateral legal consequences that affect the rights of a party flow from the issue to be determined. See Keezel v. State, 358 So.2d 247 (Fla. 4th DCA 1978).
Here, we address the issue of collateral legal consequences flowing from an involuntary commitment. Section 394.457(8), *213 Florida Statutes (1989), states that "[f]ees and fee collections for patients in treatment facilities shall be according to s. 402.33." In turn, section 402.33(8), Florida Statutes (1989), reads as follows:
(8)(a) Unpaid fees for services provided by the department to a client constitute a lien on any property owned by the client or the client's responsible party which property is not exempt by s. 4, Art. X of the State Constitution. If fees are not paid within 6 months after they are billed, the department shall charge interest on the unpaid balance at a rate equal to the average rate of interest earned by the State Treasury on state funds deposited in commercial banks as reported by the Treasurer for the previous year. The department is authorized to negotiate and settle any delinquent account, and to charge off any delinquent account even though the claim of the department may be against the client, a responsible party, or a payor of third-party benefits, either directly for the department or as a fiduciary for the client or responsible party.
(b) If negotiation and settlement cannot be effected within a time period established by its rules, and if charging off the account is not appropriate, the department shall, if it is cost-effective to do so, file the lien for the unpaid fees for recordation by the clerk of the circuit court in such county or counties which the department determines to be in the best interest of the State. Services for which fees were charged shall constitute a claim against the client, the client's responsible party, or any insurer obligated to pay for the services provided. Such liens and claims shall be enforced on behalf of the State by the department. Liens and claims upon recordation by the clerk of the circuit court shall be continuing obligations until 3 years after the demise of the client or the client's responsible party, unless satisfied earlier.
(c) Upon the death of a person against whom the department has a claim, the department shall file such caveats as are in the best interest of the State. If the department effects recovery, the fund from which the filing fee for the caveat was paid shall be reimbursed.
The imposition of a lien under section 402.33(8) on the property of an involuntarily committed person is a collateral legal consequence. In all probability, a lien will be filed by the Department of Health and Rehabilitative Services (HRS) long after the expiration of the time for filing an appeal from an order of commitment. In fact, the discretion as to whether and when to file the lien rests solely with HRS. Because section 402.33(8) affects a person involuntarily committed beyond the person's initial release, the statute has collateral legal consequences.
The State argues that even if section 402.33(8) does provide a collateral legal consequence, Godwin failed to show that the consequences applied to her case. The State notes that section 402.33(2)(g) reads in part: "[f]ees, other than third-party benefits and benefit payments, may not be charged for services provided to indigents whose only sources of income are from state and federal aid."
Further, section 402.33(1)(g) defines "state and federal aid" as "cash assistance of cash equivalent benefits based on an individual's proof of financial need, including, but not limited to, aid to families with dependent children and food stamps." The statutory exceptions are limited to protecting persons whose sole income is from "[s]tate and federal aid." Even if Godwin does not receive state or federal aid she nevertheless may be indigent, and subject to imposition of a lien in the future despite her indigency. The State further argues that section 402.33(6)(a) keeps HRS from collecting fees against Godwin. Section 402.33(6)(a) provides: "[t]he department may not require a client or responsible party to pay fees it may assess that exceed the client's or responsible party's ability to pay." While section 402.33(6)(a) may restrict HRS's ability to collect fees from Godwin, the statute does not rule out the possibility that HRS may attach a lien to Godwin's property in the future. In this case, HRS has been silent as to whether it will file a lien in the future, and, therefore, *214 Godwin still is subject to the possibility of a collateral legal consequence.
The State asserts that Godwin can challenge the lien at the time that HRS files it, and, until the lien is filed, Godwin has not been subjected to collateral legal consequences. There are two reasons, however, for allowing Godwin's appeal of her involuntary commitment to proceed in the Court. First, there is no statutory means provided to challenge a lien imposed after an improper commitment short of challenging the validity of that commitment. Second, Godwin's appeal is timely. If a person is allowed to challenge the involuntary commitment only after the lien has been imposed, the courts will be faced with the problem of reconstructing the record of the involuntary commitment some time in the future. The validity of the initial commitment is best examined while a record is readily available.
In State v. Kinner, 398 So.2d 1360 (Fla. 1981), we held that a person's release from confinement made the issue of evidence supporting an involuntary commitment moot. However, in Kinner, the parties did not raise the issue of collateral legal consequences, and the Court did not address the issue which is presented here. Thus, we distinguish Kinner.
Godwin's appeal is not moot because section 402.33(8) allows for the imposition of a lien for unpaid fees flowing from an involuntary commitment, and HRS has not indicated a waiver of its right to impose a lien. We recognize that other consequences may follow an involuntary commitment under The Baker Act, such as the stigma that society may attach, as well as some restrictions on a person's privileges and opportunities. See, e.g., § 322.05(5), Fla. Stat. (1989) (restriction on drivers' licenses); § 97.041(3)(a), Fla. Stat. (1989) (restriction on right to vote); § 790.06(10), Fla. Stat. (1989) (restriction on right to carry a concealed weapon). While we recognize these consequences are significant, we hold that they do not rise to the level of collateral legal consequences. Restrictions imposed as the result of a commitment can be or are removed when the patient is discharged or released from active treatment. See § 394.469(4), Fla. Stat. (1989).
Thus, we answer the rephrased question in the negative. We quash the opinion below and remand this case for further proceedings consistent with this opinion.
It is so ordered.
OVERTON, McDONALD and GRIMES, JJ., concur.
KOGAN, J., concurs in part and dissents in part with an opinion, in which SHAW, C.J. and BARKETT, J., concur.
KOGAN, Judge, concurring in part, dissenting in part.
I agree with the majority to the extent it holds that this case cannot be dismissed for mootness, since there are collateral legal consequences that still may adversely affect Godwin. I dissent, however, from that portion of the majority opinion suggesting, first, that the statutory lien is the sole collateral legal consequence and, second, that there might be no remaining collateral legal consequences if HRS waived its right to impose the lien. To imply that this is the sole collateral consequence is tantamount to denying the debilitating stigma  both legal and social  that continues to be attached to people who have histories of mental disability.[1] If that stigma was imposed *215 illegally, I believe that both justice and the Florida Constitution demand that a full appellate remedy must exist.
The stigmatization of the mentally disabled continues to occur in our society despite the fact that medical science now has repudiated or discredited many of the often inhumane policies and assumptions upon which the stigma originally was based. Until quite recent times, for example, our society frequently relied on a system of involuntarily warehousing the mentally disabled  or those unjustly labeled as such  under conditions that often were cruel and wasteful. In more than a few cases, no effort was made to integrate into society even those mentally disabled persons who could have responded favorably to treatment, therapy, or appropriate education. Indeed, some of these human warehouses were little more than prisons used to lock away those whose only crime was being labeled as mentally disabled. Both legally and socially, such persons were treated on a par with convicted criminals.
Today, new drugs and techniques have encouraged medical personnel to move away from the old system of warehouses and make a concerted effort to integrate the mentally disabled fully into society, wherever possible. Our society has begun to learn that many mentally disabled persons or those with a history of mental disability can be productive, useful citizens.
However, in the minds of many, a diagnosis or history of mental disability remains a mark of stigma just as much as it was a century ago. This conclusion was explicitly recognized when Congress and President Bush approved the Americans with Disabilities Act of 1990[2] and directly outlawed the irrational discrimination often visited upon otherwise able-bodied persons with histories of mental disability. Indeed, the Congressional committee reports stressed that witnesses at public hearings had identified frequent examples of discrimination based on the fact that a person either has a history of mental disability or was incorrectly diagnosed as being mentally disabled.[3]
Florida also has enacted laws to eliminate discrimination against such persons. E.g., §§ 760.22(7), 760.23, Fla. Stat. (1989) (housing discrimination); accord § 228.2001, Fla. Stat. (1989) (discrimination in educational programs); § 760.10, Fla. Stat. (1989) (employment discrimination). These federal and Florida laws show that the legal system is making an effort to catch up with the progress now being made in the field of mental health. The law itself is beginning a process of rooting out acts of irrational prejudice based on mental disability, just as the law in the 1960s began eliminating the irrational bigotry posed by racism.
Yet, the very necessity of such laws underscores how painfully widespread such prejudice and bigotry are. Thus, if for no reason other than the historical stigma of mental disability, I believe that an order of civil commitment by its very nature involves many important collateral legal consequences. Any judicial proceeding that effectively brands a person with a label that may result in invidious, illegal discrimination clearly has collateral legal consequences. By recognizing the gravity of such discrimination, federal and Florida civil rights laws have plainly identified a significant collateral legal consequence of a civil commitment order.
Yet stigma is not the sole effect of a civil-commitment order. In reviewing Florida law, I am immediately struck by the wide array of legal consequences, both profound and trivial, that can flow from a civil commitment hearing. In only a few words, the majority opinion dismisses these consequences on grounds they "can be or are removed when the patient is discharged or released from active treatment." Majority *216 op. at 7. Some of these legal consequences may, but others clearly are not.
Moreover, I disagree with the implicit conclusion that no continuing legal harm has been done simply because some of these disabilities may have been removed when an illegal civil commitment itself has ceased. Even if all of them were instantaneously removed, I could not agree. We here in this Court, reviewing nothing but an abstract and voiceless record, tend to forget the very real and disruptive legal consequences that can flow from an illegal civil commitment. Caught up in our review of these cold words printed on cold paper, we tend to forget exactly what civil commitment means: The person is taken out of society, deprived of liberty, stripped of the right to make personal and legal decisions, and involuntarily subjected to examination and treatment.
There is very little difference between this procedure and incarceration for crime. And the continuing disruption of a person's life caused by illegal civil commitment can be every bit as devastating as illegal incarceration. All aspects of the person's life can be rendered chaotic. Business and employment opportunities may languish. Marriages may sour from the strain of separation and stigma, causing divorce. Advantages may evaporate. Legal rights may be neglected, leading to continuing loss. In effect, the majority opinion appears to be saying that persons can be unlawfully deprived of virtually all their civil rights for the duration of their civil commitment, and have no recourse whatsoever even if a direct and provable harm has resulted.
And my review of the law discloses one point very vividly: The potential loss of civil rights during the period of an illegal civil commitment is truly staggering, exceeded only by imprisonment for crime. Persons adjudged to be incompetent may not register to vote, section 97.041(3)(a), Florida Statutes (1989), and may be stripped of their voter registration by court order. § 744.3215(2)(b), Fla. Stat. (Supp. 1990). They may not register for a drivers' license, section 322.05(5), Florida Statutes (1989), and a court may confiscate any such license previously given them. § 322.2505, Fla. Stat. (1989). In some circumstances, they may be tested for acquired immune deficiency syndrome (AIDS) without their consent. § 381.609(3)(i)(3), Fla. Stat. (Supp. 1990).
Florida law specifies that incompetent persons cannot consent to an abortion on their own behalf. § 390.001(4), Fla. Stat. (1989). A court can deprive them of the right to marry, to personally apply for government benefits, to travel, or to seek or retain employment. § 744.3215(2), Fla. Stat. (Supp. 1990). Likewise, a court may delegate to someone else the authority to make personal and business decisions for an incompetent person; this includes the right to enter contracts, the right to sue and be sued, the right to manage property, the right to make gifts, the right to determine one's place of residence, the right to consent to medical treatment, and the right to make decisions about social matters in general. § 744.3215(3), Fla. Stat. (Supp. 1990).
Incapacitated persons or those committed to a mental institution cannot hold a concealed weapons' permit, § 790.06(10), Florida Statutes (1989), or carry a weapon openly. Compare § 790.053, Fla. Stat. (1989) with § 790.25(2)(b)1., Fla. Stat. (1989). Nor may they carry an explosives permit or use explosives. § 552.094(5)(c), Fla. Stat. (1989). It also is illegal for anyone to allow an incompetent person to participate in any "game of chance," presumably including such lawful activities as church bingo or the Florida Lottery. § 849.04, Fla. Stat. (1989).
It is true that some of the above legal disabilities can be removed relatively quickly once an unlawful civil commitment expires or otherwise ends, but others outlined below clearly cannot. For example, as the majority recognizes, any unpaid costs of an incompetent person's treatment constitute a continuing lien against that person's property in favor of the state. § 402.33(8)(a), Fla. Stat. (1989). Any evidence that persons are "mentally infirm" can be a *217 reason to exclude them from federal jury service. 28 U.S.C. § 1865(b)(4) (Supp. 1990).
Indeed, persons whose jobs depend on a professional license may be especially disadvantaged, even to the point of losing the license solely because of an unlawful civil-commitment order. In Florida, attorneys who have been civilly committed will be investigated by The Florida Bar and can be stripped of their licenses to practice. See R. Regulating Fla. Bar 4-1.1 (lawyers must be professionally competent). The same holds true in virtually every other regulated profession. E.g., Fla. Admin. Code Rule 21L-30.002((2)(g) (1990) (masseurs); Fla. Admin. Code Rule 21S-30.001(2)(d) (1990) (pharmacists); Fla. Admin. Code Rule 21SS-8.007(1)(h) (1990) (harbor pilots); Fla. Admin. Code Rule 21X-30.001(2)(h) (1990) (veterinarians); Fla. Admin. Code Rule 21Z-14.004(2)(r) (1990) (nursing home administrators); Fla. Admin. Code Rule 21A-36.001(3) (1990) (accountants); Fla. Admin. Code Rule 21G-13.005(3)(w) (1990) (dentists and dental hygienists); Fla. Admin. Code Rule 21H-19.004(2)(p) (1990) (engineers).
Moreover, persons who are unlawfully committed may lose a job simply by virtue of the fact that their detention prevents them from going to work. The loss of the job could continue to have an impact on those persons long after the civil commitment ends, harming both themselves and their families. The prior illegal commitment also may render that person less able to find new work because of the illegal but still widespread discrimination against the mentally disabled. Once again, this equates to a continuing loss of income, and the possibility of mounting debts and even bankruptcy. These clearly are collateral legal consequences.
Indeed, civil commitment's impact on a person's job status highlights one of the most disturbing aspects of the majority opinion. The opinion fairly can be read as saying that a person who has lost a job, a job opportunity, or a professional license because of a prior illegal civil commitment order has suffered no collateral legal consequence. If this is the intent of the opinion, it is a truly astounding sentiment. There are few more important things in a person's life, both legally and socially, than the opportunity to earn a living.
In effect, the majority implies that the state itself can illegally label a person as "mentally disabled"; that this erroneous label then can be used as the basis for denying, revoking, or jeopardizing a professional license, a job, or a job opportunity; and that this continuing chain of illegality with all its enormous legal and financial repercussions is not a significant enough event to warrant appellate review of the illegal state action that set the chain in motion at the outset. This is not merely illogical, but grossly unfair and contrary to basic constitutional principles.
Moreover, the list of collateral legal consequences does not end with statute books, professional regulations, and widespread employment practices. As the Court of Appeals of the District of Columbia has noted, an order of civil commitment.
while not always crippling, is certainly always an ominous presence in any interaction between the individual and the legal system. Such evidence will frequently be revived to attack the capacity of a trial witness. Depending upon the diagnosis, it may be admissible for impeachment purposes. Indeed, even in a criminal trial it may be available to attack the character of a defendant if he has put character in issue. Most significantly, records of commitments to a mental institution will certainly be used in any subsequent proceedings for civil commitment... .
In re Ballay, 482 F.2d 648, 652 (D.C. Cir.1973) (footnote omitted). Based on these reasons alone, the District of Columbia Circuit directly held that the discharge of the patient did not render moot an appeal from a commitment order. Id. at 652-53.
In the same vein, an Illinois appellate court has noted that the existence of a prior valid commitment order may increase the probability of recommitment. People v. Nunn, 108 Ill. App.3d 169, 64 Ill.Dec. 23, 438 N.E.2d 1342 (1982). In its motion to dismiss in the present case, the State itself *218 noted that Godwin herself was recommitted. The strong implication is that Godwin's prior commitment may have been a factor in the decision to commit her anew, and could well be a factor in any future commitment hearings.
The collateral consequences outlined above are not merely legally sufficient; they are overwhelming. To apply the mootness doctrine in cases of this type, even if HRS has waived its right to impose the statutory lien, would effectively say that a person unlawfully deprived of this vast array of personal liberties and legal or economic opportunity has no recourse whatsoever merely because the illegal deprivation may have been of shorter duration than the appeal. This is only little different from saying that persons unlawfully sentenced to incarceration cannot have the taint removed from their records if, by happenstance, their sentences expired before an appellate court could hear the case.
Indeed, I cannot help but note that a finding of mootness in cases of this type  even if HRS waives the lien  would create an entire category of commitment orders that for all practical purposes are not appealable. Those persons whose commitment ends before the appeal concludes would be denied further access to the courts; those whose commitments outlast the appellate process could take their appeal without hindrance. For the former, even the most blatant violation of due process or other constitutional rights would be irremediable. For the latter, the finest detail of the civil commitment order will be fully scrutinized, even if the civil commitment proves to be entirely lawful.
Such a situation plainly violates the fundamental rights of equal protection, due process, and access to courts. Art. I, §§ 2, 9, 21, Fla. Const. While I am unwilling to hold that mootness never applies to a civil commitment order, the extensive collateral legal consequences that always inhere in such an order very nearly create an insur-mountable presumption that the case is not moot. A case might be moot if the subject of the commitment order has died, but it almost never will be moot while that person lives and may suffer any of the collateral legal consequences outlined in my opinion above. Accordingly, as a matter of Florida law, I believe that a motion to dismiss an appeal from a civil commitment order is moot only if the State can demonstrate that the patient cannot possibly suffer any adverse collateral legal consequences as a result of that order. Art. I, §§ 2, 9, 21, Fla. Const.; see Lodge v. State, 597 S.W.2d 773, 775 (Tex.Civ.App.), aff'd, 608 S.W.2d 910 (Tex. 1980).
This conclusion is strongly supported by the weight of authority from other jurisdictions, most of which have reached essentially the same conclusion. Ballay, 482 F.2d at 651-52 (District of Columbia Circuit); Nunn, 64 Ill.Dec. at 25, 438 N.E.2d at 1344 (Illinois Court of Appeals); In re Hatley, 291 N.C. 693, 231 S.E.2d 633 (1977); In re Klepper, 49 Ohio St.2d 211, 361 N.E.2d 427 (1977); In re D.B.W., 616 P.2d 1149 (Okla. 1980); State v. Van Tassel, 5 Or. App. 376, 484 P.2d 1117 (1971); In re S.C., 280 Pa.Super. 539, 421 A.2d 853 (1980); Lodge; In re Giles, 657 P.2d 285 (Utah 1982); State v. O'Connell, 136 Vt. 43, 383 A.2d 624 (1978); accord Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); In re R.B., 158 N.J. Super. 542, 386 A.2d 893 (App.Div. 1978). But see In re Faucher, 558 A.2d 705 (Me. 1989); In re Ringland, 357 N.W.2d 132 (Minn. Ct. App. 1984); State ex rel. D.W. v. Hensley, 574 S.W.2d 389 (Mo. 1978); Hanson v. Bean, 364 N.W.2d 141 (S.D. 1985).
Thus, while I agree with the result reached by the majority in this case, I cannot agree with the implications made in getting there. To suggest that the lien is the only true collateral legal consequence is not supported by logic or a sense of the real-world consequences of an illegal civil commitment. Moreover, such a suggestion runs contrary to my own judicial philosophy that the law must be rooted in a full sense of humanity and imbued with compassion. We all make mistakes, including those of us who administer and review civil-commitment law. When such a mistake has resulted in a person being illegally labeled as mentally disabled and locked away, then that mistake should be as fully *219 reviewable in the appellate courts as would any other coercive deprivation of liberty. Not merely law and logic, but also humanity and compassion require that result.
SHAW, C.J. and BARKETT, J., concur.
NOTES
[1] The present trend in both medicine and law is to replace the term "mental illness" with "mental disability," since the latter is more accurate and more sensitive to the concerns of those who have a mental disability. As the United States Congress noted when it passed the landmark Americans with Disabilities Act of 1990:

The use of the term "disability" ... represents an effort by the Committee to make use of up-to-date, currently accepted terminology. In regard to this legislation, as well as in other contexts, the Congress has been apprised of the fact that to many individuals with disabilities the terminology applied to them is a very significant and sensitive issue.
As with racial and ethnic epithets, the choice of terms to apply to a person with a disability is overlaid with stereotypes, patronizing attitudes, and other emotional connotations.
S.Rep. No. 116, 101st Cong., 1st Sess. 21 (1989), I concur in this assessment and have used the term "mental disability" in my opinion to avoid the patronizing, emotion-laden epithets sometimes used in the past to describe mental disability.
[2] 42 U.S.C. §§ 12101-12213 (Supp. 1990).
[3] H.R.Rep. No. 485, 101st Cong., 2d Sess. 53 (1990), U.S.Code Cong. & Admin.News 1990, p. 267.