SCF, INC.,

      Appellant,

v.

FLORIDA THOROUGHBRED
BREEDERS' ASSOCIATION,
INC. DBA FLORIDA
THOROUGHBRED BREEDERS'
AND OWNERS'
ASSOCIATION, INC.; AND
DEPARTMENT OF BUSINESS
AND PROFESSIONAL
REGULATION, DIVISION OF
PARI-MUTUEL WAGERING,

      Appellees.
_____/

IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D16-3211

Opinion filed October 16, 2017.

An appeal from an order of the Division of Pari-Mutuel Wagering, Department of Business & Professional Regulation.

David S. Romanik of David S. Romanik, P.A., Oxford, for Appellant.

J. Stephen Menton and Tana D. Storey of Rutledge Ecenia, P.A., Tallahassee, for Appellee Florida Thoroughbred Breeders' Association, Inc.

Jason L. Maine, Dwight O. Slater, Chevonne T. Christian, and Caitlin Rose Mawn, Tallahassee, for Appellee Department of Business & Professional Regulation.


MAKAR, J.

Florida-grown thoroughbred racehorses, and the prize money they earn, underlie this dispute involving a breeder, the industry association that controls in-state thoroughbred racing, and the Florida agency providing regulatory oversight. The question we address is whether the breeder has legal standing to challenge the annual plan for distribution of owners' and breeders' awards as non-compliant with statutory requirements.

I.

Ocala is the county seat of Marion County, Florida, both of which promote their North Florida community as the "Horse Capital of the World™" due to its rich history of equestrian farms and success in national thoroughbred racing, including the first Florida-bred horse to win the Kentucky Derby (Needles, in 1956) and the last horse to win the Triple Crown (Affirmed, in 1977) before American Pharoah (who has a Florida connection to Affirmed's bloodline) ended the streak in 2015 by winning the "Grand Slam" of American horse racing.[1] Over the years, Florida's equestrian success has transformed the niche North Florida cottage industry of the early 1900s into a major economic force in the state:

---

[1] See generally Charlene R. Johnson, Central Florida Thoroughbreds: A History of Horses in the Heart of Florida, (2014) (detailing the equine history of Central Florida); American Pharoah, Wikipedia, https://en.wikipedia.org/wiki/American_-Pharoah (last visited April 17, 2017) (Triple Crown of Kentucky Derby, Preakness Stakes, and Belmont Stakes plus the Breeders' Cup Classic).

The equine industry in Florida is big business. Florida ranks only behind Texas and California with respect to the total number of horses (500,000). Approximately 440,000 Floridians are involved in the industry as horse owners, service providers, employees, and volunteers. Even more participate as spectators at equine-related events. The horse racing industry alone has a greater overall economic impact than baseball's spring training. All equine activities generate approximately $5 billion for Florida's economy. People from all walks of life are involved in Florida's total equine industry, from the wealthiest families (*e.g.,* the Bloomberg, Steinbrenner, Gates, and Onassis families) to your regular Joe farmers, horse trainers, children and retirees.[2]

As the industry and its gambling revenues grew, the legal and regulatory structure overseeing its operation also expanded, though the heart of thoroughbred breeding and its administration remained in the Ocala area.

At the epicenter of the industry are two entities: the Florida Department of Business & Professional Regulation, Division of Pari-Mutuel Wagering, which is the regulatory arm of the state, and the Florida Thoroughbred Breeders' Association, Inc., also known as Florida Thoroughbred Breeders' & Owners' Association (FTBOA), which is a unique Ocala-based, private, non-profit corporation that has been granted legal authority to promote Florida's thoroughbred industry and receive monies and distribute awards to owners of the top Florida-bred thoroughbred competitors. In its own words, it "administers the

---

[2] Amanda Simmons Luby & Renée E. Thompson, <u>Taking Notice of Florida's Antiquated Equine Lien Laws</u>, Fla. B.J., November 2014, at 16, 16 (footnote omitted).

lucrative awards program which encourages individuals to participate in the industry in the Sunshine State."[3] FTBOA was initially established in 1945 and was specifically designated by the Legislature in 1977 to collect and distribute wagering prize monies as awards, section 550.38, Florida Statutes (1977), Chapter 77-167, Laws of Florida, which were considered an "important factor[] in attracting the entry of well-bred horses in Florida racing meets, which in turn helps to produce maximum racing revenues for the state and the counties." Id. § 550.262, Fla. Stat. (1977).

A recurrent theme in FTBOA's history is the tension between the association's economic interests and those of the breeders and owners, each seeking a share of the pool of funds dedicated to promoting the State's economic interests and encouraging development of successful home-grown thoroughbred racehorses.[4] This tension has persisted through good economic times in the

---

[3] See About FTBOA, Florida Thoroughbred Breeders' & Owners' Association, https://www.ftboa.com/News/About-Us (last visited April 14, 2017).

[4] Years ago, the Florida Supreme Court and this Court nullified statutes that lacked direction on how revenues generated for the promotion of Florida-bred racehorses were to be used. See Horsemen's Benevolent & Protective Ass'n, Fla. Div. v. Div. of Pari-Mutuel Wagering, Dep't of Bus. Reg., 397 So. 2d 692, 695 (Fla. 1981) (Striking down a statute "contain[ing] no provision for how the funds paid to the horsemen's association must be spent or that they must be spent in furtherance of the legitimate state objective herein advanced," such that the "statute effectually requires payment of money to a private association to do with as it chooses."); see also Fla. Horsemen Benevolent & Protective Ass'n v. Rudder, 738 So. 2d 449, 452 (Fla. 1st DCA 1999) (Striking down statute that "places no obligation upon the association as to how funds deducted pursuant to the statute are to be expended and

4

industry, as well as the bad times (such as when federal tax laws changed in the 1980s making equine investments less remunerative), the focus often being on how awards are determined. Thoroughbred breeders' awards were initially set by statute, see Chapter 63-161, Laws of Florida (establishing section 550.38), but over the decades, that system evolved into one in which FTBOA is empowered to decide the amount and distribution of awards. Ch. 92-348, § 31, Laws of Fla. (establishing section 550.26165 and specifying the percentage of race purses to be distributed as awards to registered Florida-bred horses, such as up to twenty percent, but not less than fifteen percent, from available funds); see also Ch. 2000-354, § 25, Laws of Fla. (amending section 550.26165(1)). Whether set by statute or by the discretion of FTBOA, the goal of the breeders' awards are "to encourage the agricultural activity of breeding racehorses in this state." § 550.26165, Fla. Stat. (1993).[5]

With this brief historical overview, we turn to the central feature of this case, which is the statutory mandate that FTBOA annually create a "uniform rate and procedure for the payment of breeders' and stallion awards" that "must provide for the maximum possible payments within revenues." §§ 550.2625(3)(h), 550.26165(2), Fla. Stat. (2017). FTBOA "shall make breeders' and stallion award

it specifies no benefit that is to be received by owners or trainers.").

[5] Until 1999, the complete statutes of Florida were published only in odd-years, supplements in even-years. Because section 550.26165 was enacted in December 1992, after the supplement was published, it first appears in the 1993 statute book.

payments in strict compliance with the established uniform rate and procedure plan." Id. § 550.2625(3)(h). And the fund of undistributed breeders' awards shall not be allowed "to grow excessively." Id. § 550.26165(4).

Monies distributed as breeders' awards are limited "to breeders of registered Florida-bred horses winning horseraces" and, under the current statutory structure, must be within certain parameters. For example, "awards shall be given at a uniform rate to all winners of the awards, shall not be greater than 20 percent of the announced gross purse, and shall not be less than 15 percent of the announced gross purse if funds are available." § 550.26165(1), Fla. Stat. To provide a floor below which FTBOA awards should not go, "[p]riority shall be placed upon imposing [restrictions such as caps on winnings and deferred payments] in lieu of allowing the uniform rate to be less than 15 percent of the total purse payment." Id. § 550.2625(3)(h). To cover its own expenses, FTBOA is authorized to withhold up to ten percent of permitholder's payments "as a fee for administering the payments of awards and for general promotion of the industry." Id. In 2009, FTBOA was told to become more responsive to competition from other states' "rapidly changing" programs and given more flexibility to "design competitive awards programs" for inclusion in its annual plan, such as paying awards for second and third place finishes and paying awards "that are greater than 20 percent and less

6

than 15 percent of the announced gross purse" and so on. Ch. 2009-170, § 12, Laws of Fla. (adding subsection (5) to section 550.26165).

FTBOA's annual plan "must be approved by the [D]ivision before implementation. In the absence of an approved plan and procedure, the authorized rate for breeders' and stallion awards is 15 percent of the announced gross purse for each race." § 550.2625(3)(h), Fla. Stat. FTBOA must "keep accurate records showing receipts and disbursements of such payments" and "annually file a full and complete report to the [D]ivision showing such receipts and disbursements and the sums withheld for administration." The Division may "audit the records and accounts" of FTBOA "to determine that payments have been made to eligible breeders and stallion owners in accordance with this section." Id. § 550.2625(3)(i). The Division "may order [FTBOA] to cease and desist from receiving funds and administering funds received under this section" upon a finding of non-compliance "with any provision of this section[.]" Id. § 550.2625(3)(j).

Since 1996, Southern Cross Farms, doing business as SCF, Inc., has been among the hundreds of thoroughbred breeders and owners in the Ocala area. It has been successful, receiving breeders' awards from FTBOA every year since 1998 (save 2001), representing thirty-one racehorses earning approximately $138,000 in award monies. Recently, SCF earned $17,405.00 in breeders' awards in 2015 (four different horses) and intended to race these same horses in 2016 (one of which it

7

alleged in its amended petition had already won a breeders' award in 2016); it also alleged it had "3 two-year Florida-bred horses in final preparation for launching their racing careers in 2016 at the racetracks in South Florida." SCF's membership in FTBOA lapsed, but that does not prevent it from eligibility to receive awards.

In response to the Division's approval of FTBOA's proposed plan for the 2016 race year, SCF initiated an administrative proceeding to challenge the plan's compliance with statutory requirements, principally those related to FTBOA's responsibility to ensure that award amounts are set appropriately. SCF filed an amended petition, but the administrative law judge (ALJ) granted the motions to dismiss of FTBOA and the Division, finding that SCF lacked standing because its substantial interests were not affected by the Division's "mere approval" of the plan. Despite SCF's unbroken track record of awards in the fifteen years leading up to its administrative challenge, the ALJ found it "much too speculative" that SCF would again receive awards that might be diminished by FTBOA's actions. In addition, the ALJ recognized that although SCF had an interest in how the plan is "ultimately implemented, it has no interest whatsoever in the agency action in the present matter, i.e., approval of the Plan by the Division." The ALJ noted that if SCF were a member of FTBOA, which is not required to win awards, it could "petition [FTBOA] in some fashion to seek redress or input about the proposed plan before it is submitted to the Division. But once the Division approves the

8

Plan, it is in place and cannot be disturbed." Based on the ALJ's order, the Division dismissed SCF's amended petition with prejudice, resulting in this appeal.

II.

The issue presented is whether SCF has standing to bring an administrative challenge against FTBOA's approved annual plan for breeders' awards as being non-compliant with the statutory requirements for such a plan. This question is answered by analyzing whether SCF has a "substantial interest" to be determined in the proceeding challenging the statutory compliance of FTBOA's plan. § 120.52(13)(b), Fla. Stat. To determine whether a third-party has a substantial interest in the outcome of a proceeding for standing purposes, the test set out in Agrico Chemical Company v. Department of Environmental Protection, 406 So. 2d 478, 482 (Fla. 2d DCA 1981), is applied, consisting of two questions: 1) will the party suffer injury in fact, which is of sufficient immediacy to entitle it to a section 120.57 hearing; and 2) does the party have a substantial injury of a type or nature for which the proceeding is designed to protect? Id. "The first aspect of the test deals with the degree of injury. The second deals with the nature of the injury." Id.

But first we address the claim of FTBOA and the Division that this case is moot because all awards for the 2016 year have been issued and paid, leaving no meaningful remedy for SCF; they say SCF seeks an advisory opinion on "what should be included in future" plans and that SCF's legal claims are not ones that

9

would recur. But SCF does not seek payment or rescission of 2016 awards. Instead, the primary relief it requests in this appeal is the determination that it had standing to pursue its claims of statutory non-compliance against FTBOA and the Division, an important issue that is likely to recur and over which we have jurisdiction despite it being moot as to the 2016 plan. Godwin v. State, 593 So. 2d 211, 212 (Fla. 1992) (mootness does not deprive appellate court of jurisdiction where issue is likely to recur).

Turning back to the merits, SCF alleged that the 2016 plan did not comply with statutory mandates and thereby contained breeders' awards that were below levels that should otherwise have been met and for which SCF would be eligible and likely would have received in some measure due to its having done so for seventeen of the past eighteen years. As to the second part of the Agrico test, it is clear that SCF meets its requirements. To begin, the Legislature's stated purpose of the statutory framework at issue is to "encourage the agricultural activity of breeding and training racehorses in this state" by distributing "awards to breeders of registered Florida-bred horses winning horseraces." See § 550.26165(1), Fla. Stat. SCF's petition alleges a scope of interest and activities (breeding and racing thoroughbred horses in Florida), and relief requested (an annual plan that complies with statutes that seek to maximize the payment of breeders' awards) that demonstrates the type of substantial interest that can be administratively addressed

10

and resolved. Indeed, the raison d'être for the plan to establish breeders' awards of optimal magnitude is to encourage the very activity in which SCF has successfully engaged. See § 550.26165(2) (annual plan "must provide for the maximum possible payments within revenues").

This type of economic interest has been recognized as sufficient to establish standing in this same industry. In Florida Horsemen Benevolent & Protective Association v. Rudder, three Florida thoroughbred owners—who were not members of an association representing most thoroughbred racehorse owners and trainers—sued the association, asserting economic harm. 738 So. 2d 449, 451 (Fla. 1st DCA 1999). The claimed injury was that the purse the three owners might have received was reduced by a statutory one-percent deduction paid directly to the association. Id. Because the "purses that the [owners] would otherwise receive are diminished by the one percent deduction made in favor of the [association]. These [owners] therefore satisfy the general standing requirement that the case involve an actual controversy as to the issue or issues presented." Id. at 451. Given that the Florida thoroughbred owners in Rudder had standing in a civil court, and that "[e]xpansion of public access to the activities of governmental agencies was one of the major legislative purposes of the new Administrative Procedure Act,"[6] it

---

[6] See Fla. Home Builders Ass'n v. Dep't of Labor & Emp't Sec., 412 So. 2d 351, 352-53 (Fla. 1982); Rosenzweig v. State Dep't of Transp., 979 So. 2d 1050, 1053 (Fla. 1st DCA 2008) ("[O]ne of the major legislative purposes of the

11

follows that SCF's substantial interests are sufficient under the second part of the Agrico test.

Next, as to the first part of the Agrico test, FTBOA and the Division claim that SCF had nothing more than a speculative prospect of earning an award in 2016; they also argue that the prospects of SCF earning a larger award (if the plan complied with statutes) are irrelevant and likewise speculative. But the proper inquiry is on the likelihood of injury, not that it be certain. With the past as a predictor, it was substantially certain that SCF would win another award in 2016 (at the time of its amended petition it had already done so). Indeed, none of the three thoroughbred owners in Rudder had the fifteen-year consecutive string of awards that SCF had achieved at the time of its petition, making the case for SCF's standing that much stronger.

As to whether SCF might earn a larger award, FTBOA and the Division assert that SCF has no direct injury from the adoption of the plan and that potential future applications of the plan to SCF were speculative. In short, they claim that the legislative grant of authority to FTBOA to develop a plan of breeders' awards that compete with those of other states "does not contemplate participation by individual breeders seeking to protect their individual economic interests." Such a conclusion—and that of the ALJ that SCF has "no express entitlement" to a

Administrative Procedure Act was the expansion of public access to the activities of governmental agencies[.]").

12

statutory award—overlooks that much of the impetus and focus of the statutory framework is to optimize payouts to top Florida-bred horse owners whose horses excel in Florida races, SCF being one. Because the statutory framework was set up to provide economic inducements for Florida breeders like SCF to operate successful equestrian programs in-state, it would be a curious conclusion that none of them individually or as a group has a legal basis to complain about the plan's compliance with statutory guidelines as to awards. Fla. Home Builders Ass'n, 412 So. 2d at 354.

FTBOA and the Division point out that a proposed plan must be submitted at least sixty days before the beginning of the payment year, such that "there is simply no time or contemplation" for a third-party challenge to be made; instead, only FTBOA and the Division are allowed to be involved in the approval process. The finality of the plan once approved, and the statutory admonition that it not be modified thereafter absent "the most compelling reasons," section 550.26165, Florida Statutes, is a two-edged sword. Though the compacted time-frame may suggest that third-party challenges might be problematic, the seeming irreversibility of the plan once finalized weighs in favor of the interests asserted by SCF; absent early correction, statutory compliance may never be achievable, as this case demonstrates. Moreover, the finality of the plan weighs in favor of allowing a challenge. Unlike the situation in Suwannee River Area Council Boy

13

Scouts of America v. State, Department of Community Affairs, 384 So. 2d 1369, 1374 (Fla. 1st DCA 1980), which involved a "binding letter" process that merely determined "whether another layer of government must be dealt with by a developer," the plan under scrutiny here is a final one not subject to any layer of government scrutiny other than by the Division. As we said in Ybor III, Limited v. Florida Housing Finance Corporation, 843 So. 2d 344, 346 (Fla. 1st DCA 2003), the "administrative need for decisional finality is a nullity if the road toward closure does not permit a reasonable point of entry for an aggrieved applicant to speak and be heard." The Legislature has neither expressly nor impliedly said that the very persons the statutory framework was designed to benefit—breeders of Florida thoroughbred racehorses—are to be excluded from administratively challenging a plan that, by statute, is intended to benefit them; and we are disinclined to do so absent clearer legislative direction. See Rosenzweig, 979 So. 2d at 1054 ("[I]t is clear that if *anyone* has the ability to challenge the Department's interpretation of section 335.065, which specifically relates to bicycle lanes, it would be those seriously involved in bicycling.").

REVERSED.

WINSOR, J. and BROWN, JOHN, ASSOCIATE JUDGE, CONCUR.

14