# FIRST DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

Nos. 1D17-3858
1D17-3883
1D17-4092

_____

REHABILITATION CENTER AT
HOLLYWOOD HILLS, LLC,

    Appellant/Petitioner,

    v.

STATE OF FLORIDA, AGENCY FOR
HEALTH CARE ADMINISTRATION,

    Appellee/Respondent.

_____

On appeal from the Agency for Health Care Administration.
Justin M. Senior, Secretary.

Petition for Review of Emergency Administrative Order—
Original Jurisdiction.

Petition for Review of Emergency Suspension Order—Original
Jurisdiction.

June 20, 2018

WOLF, J.

    Rehabilitation Center at Hollywood Hills, LLC (the facility)
challenges 3 emergency orders entered by the Agency for Health
Care Administration (AHCA) after 8 of the facility's residents

died during the aftermath of Hurricane Irma when the facility lost power to its air conditioner.

In case 1D17-3883, AHCA issued an Immediate Moratorium on Admissions, prohibiting the already-evacuated facility from admitting new residents. In 1D17-3858, AHCA issued an Immediate Suspension Final Order (ISFO), which suspended the facility's participation in the Medicaid program. In 1D17-4092, AHCA issued an Emergency Suspension Order, which suspended the facility's license to operate as a nursing home.

The facility filed petitions for writ of certiorari challenging the Immediate Moratorium on Admissions and the Emergency Suspension Order, which were non-final orders, and a notice of appeal challenging the ISFO, which was a final order. These cases are consolidated for purposes of this opinion.

The facility asserts that all three orders fail to provide sufficient specific factual allegations justifying emergency action. In addition, it asserts that AHCA failed to provide an administrative hearing following the ISFO.

We determine the challenge to the Immediate Moratorium on Admissions in case 1D17-3883 is moot in light of the subsequent Emergency Suspension Order in case 1D17-4092, which suspended the facility's license to operate a nursing home. We find that the orders in cases 1D17-3858 and 1D17-4092 contain sufficient factual allegations to support their imposition.

As to the failure to provide an administrative hearing after the ISFO, we affirm because the record does not demonstrate the facility requested a hearing, and the facility failed to raise an issue concerning the order's failure to apprise the facility of a point of entry into the administrative proceeding until the reply brief. Therefore, the issue is not properly before this court on appeal.

## I. FACTS

### *Immediate Moratorium on Admissions, 1D17-3883*

On September 13, 2017, AHCA issued the Immediate Moratorium on Admissions, which prohibited the facility from "admit[ting] for services any individual." The order made the following factual findings:

a. On September 10, 2017, [the facility] became aware that its air conditioning equipment had ceased to operate effectively.

b. In addition to contacting the local electrical power provider, [the facility] situated eight (8) portable air coolers throughout the facility and equipped the halls with fans.

c. Between 1:30 AM and 5:00 AM on September 13, 2017, several residents suffered respiratory or cardiac distress. Eight (8) of those residents ultimately expired.

d. Emergency personnel and law enforcement responding to these multiple emergency medical events directed [the facility], as a result of the heat in the building, to evacuate the second floor of the Facility.

e. [The facility] ultimately evacuated the entire building.

Based on these facts, AHCA concluded that a moratorium was necessary because the "practices and conditions at the [facility]" presented an "immediate serious danger" or "threat" to the residents. It found the "[facility's] deficient conduct is widespread and places all future residents at immediate threat to their health, safety, and welfare. The [facility] has demonstrated that its physical plant cannot currently provide an environment where residents can be provided care and services in a safe and sanitary manner." AHCA asserted the moratorium was necessary because the facility's "deficient practice exist [sic] presently; have existed in the past, and more likely that not will continue to exist" without intervention. AHCA reasoned the residents needed

3

protection from the "unsafe conditions and deficient practices" at the facility because it was "ill-equipped to provide for resident health, safety, and welfare," and "the statutory and regulatory mechanisms enacted for their protection have been breached." AHCA concluded this remedy was the least restrictive action the agency could have taken and was narrowly tailored.

As supporting authority, AHCA cited sections 120.60 and 408.814, which permit it to take emergency action when it finds an immediate threat to public safety, health, safety, or welfare. §§ 120.60(6), 408.814(1), Fla. Stat. (2017). It also cited section 400.141, Florida Statutes, which requires nursing homes to maintain their facilities in a safe manner, and section 400.102, which permits the agency to act where nursing home staff commits an intentional or negligent act that materially affects the health and safety of residents. §§ 400.141(1)(h), 400.102(1), Fla. Stat. (2017).

*Immediate Suspension Final Order, 1D17-3858*

On September 14, 2017, AHCA issued an ISFO suspending the facility from participating in the Medicaid program. The order incorporated by reference the factual findings from the Immediate Moratorium on Admissions and added the following findings:

3. Between 1:30 a.m. and 5:00 a.m., on September 13, 2017, several residents suffered respiratory or cardiac distress. Eight (8) of those residents ultimately expired.

4. Shortly after 4:00 a.m. on September 13, 2017, the City of Hollywood Police Department and Hollywood Fire Rescue responded to a call for service at the [] facility. Several patients were found in varying degrees of medical distress, three patients were found deceased, and others were in need of immediate transport.

5. Due to the conditions of the facility, Hollywood Police Department and Hollywood Fire Rescue mobilized nine (9) rescue units to evacuate all of the remaining patients.

4

6. . . . . The facility is located directly across the street from a hospital . . . .

7. The hospital . . . was operational and able to receive patients.

. . . .

11. The matter remains under active criminal investigation.

The order reiterated the conclusion from the moratorium that the "practices and conditions" at the facility presented an immediate serious danger to the residents.

As authority, the order cited section 409.913, Florida Statutes, and Florida Rule of Administrative Procedure 59G-9.070, which permit AHCA to suspend Medicaid participation upon information of patient abuse or neglect, and section 120.569(2)(n), which permits agencies to enter immediate final orders if an immediate danger to public health, safety, or welfare so requires.

*Emergency Suspension Order, 1D17-4092*

On September 20, 2017, AHCA entered an Emergency Suspension Order, suspending the facility's license to operate as a nursing home. This order contained significantly more factual findings. As to the availability of assistance for the residents, AHCA found:

Due to the active state of emergency of Hurricane Irma, the Florida Emergency Operations Center was actively staffed to assist with critical incidents. Additional emergency resources through several state and local government agencies were also available. This includes potential assistance with timely evacuation, which the Facility never requested.

After reviewing medical records, AHCA made specific factual findings for the 8 deceased residents, several of whom had documented body temperatures of between 107-109.9 degrees

5

when they died, though facility staff later went back and entered logs reflecting relatively normal body temperatures.

Residents number 2, 1, 8, and 7 all died at the hospital with elevated body temperatures. For resident number 2, facility records showed that at 7 p.m. on September 12, the resident's temperature was 99.8 degrees. At 4:32 a.m. on September 13, hospital records show the resident arrived in cardiac arrest with a body temperature of *108.3 degrees*. However, 10 minutes later, at 4:42 a.m., a nurse at the facility entered a note that the patient's temperature was 101.6 degrees. AHCA found the *"nursing note, though not so designated by staff, is an apparent 'late entry' as the resident had already been transported to the hospital at the time of the note's entry. . . .* It is extremely disturbing that the facility made a late entry claiming the temperature of 101.6, when the resident was already dying at the hospital with a temperature of 108.3." (Emphasis supplied).

Similarly for resident number 1, a "late entry" in the facility's records reflected a temperature of 97 degrees at midnight. The resident was discovered in respiratory distress with blue lips at 1:30 a.m. and emergency services were contacted. At 3:43 a.m., the hospital documented the resident's temperature to be *107 degrees*. The patient died "with a diagnosis of heat stroke."

Resident number 8 had a temperature of 98.2 degrees on the afternoon of September 12, and a temperature of 101 degrees at 3:31 a.m. on September 13, according to facility records. A "late entry" with no time description stated the resident went into respiratory distress. Emergency services were called. The resident arrived at the hospital at 6:42 a.m. with complaints of heart attack and "severe hyperthermia." The patient died 7 minutes later with a body temperature of *109.9 degrees*.

Resident 7 had a body temperature of 97 degrees at 10:34 p.m. on September 12 according to facility records. At 6:55 a.m. on September 13, emergency medical records reflected the patient had an altered mental state, hyperthermia, and respiratory distress. The resident's temperature at the time was documented as 103.3 degrees and the skin was "hot." Hospital records stated the patient was admitted at 7:03 a.m. without a

pulse. The patient was pronounced dead at 7:54 a.m. with a body temperature of *108.5 degrees.*

For patient 5, facility records reflected a temperature of 98.6 degrees at 2:20 p.m. on September 12. A "late entry" dated September 14 at 8:15 documented that the patient was resting in bed with even and unlabored breathing. However, the resident "*had expired before this entry was made.*" AHCA found that no other documentation regarding the patient's condition or hospitalization was made for review.

Residents 4, 6, and 3 died at the facility between midnight and 1:30 a.m. on the morning of September 13. The facility did not record their body temperatures at the time of death. Resident 4 died of cardiac arrest, resident 6 was found unresponsive by facility staff, and no circumstances surrounding the death of resident 3 were provided.

AHCA found that the facility "knew or should have known the danger presented to its residents in its physical plant, yet failed to monitor, care for, and protect its residents. [Its] sole identified response was to belatedly call '911' on an individual basis as its residents suffered, one after another, cardiac or respiratory arrest," and they arrived at the hospital "too far gone and far too late to be saved." The facility was "located across the street from a large, air-conditioned public hospital," which was "fully functional," yet the facility "failed to transfer its residents . . . in a timely fashion." "These core body temperatures are the product of the facility's failure to maintain a safe environment at the facility, failure to properly monitor its patients, and failure to timely report an ongoing medical emergency. [The facility]'s records are replete with late entries."

The agency "conclude[d] that this facility's administrator and medical professionals did not know to call '911' in an ongoing emergency. As such, this facility presents a danger to every person on its premises . . . ." AHCA determined the facility's deficient practices were an immediate, serious danger to public health, safety, and welfare, were likely to continue without intervention from AHCA, and less restrictive actions, such as the assessment of fines, would not ensure future residents' safety.

7

Thus, AHCA found the emergency suspension of the facility's license was a necessary and narrowly tailored remedy.

## II. ANALYSIS

### A. Sufficiency of the Immediate Order on Moratorium of Admissions

The facility petitions this court for a writ of certiorari to quash the Immediate Moratorium on Admissions, arguing it contained insufficient factual allegations to justify emergency action. This order contains the least factual allegations of the three emergency orders. However, AHCA argues this issue is moot because this order suspending the admission of new patients was subsumed by the Emergency Suspension Order, which suspended the facility's license to operate.

The facility argues this issue is not moot for two reasons. First, the facility argues AHCA may use the moratorium as grounds to impose future penalties. Section 400.121(3)(a), Florida Statues, provides that AHCA "shall revoke or deny a nursing home license" if a facility "[h]as had two moratoria issued pursuant to this part or part II of chapter 408 which are imposed by *final order* for substandard quality of care . . . within any 30-month period." (Emphasis added). However, the moratorium was not issued "by final order." It is a non-final order. Thus, this argument is without merit.

Second, the facility argues the harm imposed by the moratorium cannot be remedied by an administrative hearing because it will be unable to resume operations until after the administrative proceedings are concluded. However, even if this court quashes the moratorium, the facility will still be unable to resume operations due to the suspension of its license through the Emergency Suspension Order, which we find to be sufficient.

A reversal of the moratorium can have no actual effect on the facility. As such, this issue is moot. *See Godwin v. State*, 593 So. 2d 211 (Fla. 1992) ("An issue is moot when the controversy has been so fully resolved that a judicial determination can have no actual effect. A case is 'moot' when it presents no actual controversy or when the issues have ceased to exist.").

Accordingly, the petition for writ of certiorari is denied as to this order.

## B. Immediate Suspension Final Order

The facility filed an appeal challenging the ISFO on two bases: (1) there were insufficient factual allegations to support the order; and (2) AHCA failed to provide an administrative hearing following entry of the order.

### (1) Sufficiency of Factual Allegations

The ISFO was entered pursuant to section 409.913, which states that if AHCA "has received reliable information of patient abuse or neglect," AHCA may enter an "[i]mmediate suspension" from the Medicaid program, provided that it "issue an immediate final order under s. 120.569(2)(n)." § 409.913(15)(p), (16)(d), Fla. Stat. Section 120.569(2)(n) states that "[i]f an agency head finds that an immediate danger to the public health, safety, or welfare requires an immediate final order, it shall *recite with particularity the facts* underlying such finding in the final order, which shall be appealable or enjoinable from the date rendered." § 120.569(2)(n), Fla. Stat. (emphasis added).

"The standard of review of an immediate final order is whether, on its face, the order 'sufficiently states particularized facts showing an immediate danger to the public welfare.'" *Robin Hood Grp., Inc. v. Fla. Office of Ins. Regulation*, 885 So. 2d 393, 396 (Fla. 4th DCA 2004) (quoting *Saviak v. Gunter*, 375 So. 2d 1080 (Fla. 1st DCA 1979)). Immediate final orders "must contain facts sufficient to demonstrate: (1) Immediate, serious danger to the public health, safety, or welfare; (2) The order takes only that action necessary to protect the public considering the emergency (i.e., the remedy is tailored to the harm); and, (3) Procedural fairness under the circumstances (the procedure provides at least the same procedural protection given by other statutes, or the state or federal Constitutions)." *Allstate Floridian Ins. Co. v. Office of Ins. Regulation*, 981 So. 2d 617, 623 (Fla. 1st DCA 2008).

The facility argues the final order fails to expressly allege abuse or neglect, or a direct causal relationship between the heat and the death of the residents. It argues the order fails to address whether there was any evidence of excessive heat in the facility, whether the patients' deaths could have been caused by the negligence of the first responders or "transfer trauma," whether the deaths would have occurred regardless of the hurricane, or whether the patients were in the facility when they "ultimately expired." The facility also argues the order did not specify whether power had been restored or whether emergency conditions still existed at the time the order was entered. It asserts the order could have been more narrowly tailored to suspend participation in the Medicaid program only until power was restored or generators were installed. Alternatively, the facility argues a range of less severe disciplinary sanctions such as fines or liens were available under section 409.913 for Medicaid providers.

Because the order reflects that the facility was evacuated, the facility argues there can be no finding of an ongoing emergency. Instead, the facility argues it is effectively being disciplined for past behavior, and disciplinary proceedings must be brought through a chapter 120 hearing after notice, not through an immediate final order.

AHCA argues these allegations are sufficient. It emphasizes that courts have considered whether or not harm has already occurred as a significant factor in determining whether there is an immediate danger to the public.

In *Tauber v. State Board of Osteopathic Medical Examiners*, 362 So. 2d 90, 93 (Fla. 4th DCA 1978), the Fourth District found the emergency suspension of a doctor's license was justified, even though the alleged malpractice occurred 110 days before, because the court could "conceive of no greater emergency of immediate necessity than that which endangers the preservation of human life." However, courts have been more reticent to find a continuing danger where a violation did not result in harm. *See St. Michael's Acad., Inc. v. Dep't of Children & Families*, 965 So. 2d 169, 172 (Fla. 3d DCA 2007) (quashing emergency order in part because there was no allegation that any child had suffered

10

injury or harm); *Daube v. Dep't of Health*, 897 So. 2d 493, 494 (Fla. 1st DCA 2005) (finding emergency order suspending a doctor's license based on allegations that he used an unauthorized Botox procedure was too broad where there was no evidence that a patient was injured, and order could have simply required him to stop using the unapproved product).

Here, AHCA alleges that 8 patients have already died, which is a significant factor in determining whether there is an immediate danger to the public.

AHCA also correctly notes that nothing in section 409.913 permits it to issue a suspension from the Medicaid program contingent upon conditions like those suggested by the facility, such the restoration of power or the installation of a generator. To the contrary, section 409.913(16)(d) mandates that it "shall impose" an "[i]mmediate suspension, if the agency has received information of patient abuse or neglect."

Though the allegations could have been more specific, the order sufficiently implied a serious failure by staff to protect the residents from dangerous conditions present in the facility. *See Bertany Ass'n for Travel & Leisure, Inc. v. Fla. Dep't of Fin. Servs.*, 877 So. 2d 854, 855-56 (Fla. 1st DCA 2004) (finding allegations in emergency order were sufficient to "support an inference" that unauthorized activity "may continue absent a cease and desist order").

While the facility is correct that emergency orders cannot be used to discipline prior conduct, prior conduct is relevant to determining future risk. "There is ample precedent supporting the suspension of a licensee upon [a] showing of past harm when the harm is sufficiently serious and of a nature likely to be repeated." *Stock v. Dep't of Banking & Fin.*, 584 So. 2d 112, 115–16 (Fla. 5th DCA 1991) (finding agency was justified in revoking license where banker withdrew money from a customer's account 8 times over a 12 month period, totaling over $60,000).

In contrast, "where the past conduct significantly pre-dates the emergency order and there is nothing else in the licensee's history that would support an inference of continuing bad conduct, allegations of past harm standing alone are insufficient

11

to support the emergency suspension or restriction of a license." *Omulepu v. State, Dep't of Health*, 198 So. 3d 1046, 1047 (Fla. 1st DCA 2016). In *Omulepu*, this court reversed an emergency order that alleged a plastic surgeon committed malpractice while operating on several patients 9 months prior to the entry of the emergency order. Because there were no allegations of misconduct prior to or after the alleged incidents, there was no indication that the doctor's past conduct was likely to continue. *Id.* at 1047-48.

Here, unlike *Omulepu*, the emergency order was entered very quickly after the alleged conduct. The order did not allege an isolated incident or a single mistake in judgment. Instead, it alleged that a total of 8 patients died over the course of several hours, 3 prior to the arrival of first responders, in a facility so hot the first responders evacuated it. The facility staff failed to evacuate the patients to the open hospital across the street even after multiple patients suffered medical distress and several died. This order sufficiently alleged an immediate, serious danger to the public health, safety, or welfare. AHCA was statutorily required to suspend the facility's Medicaid participation upon evidence of patient abuse or neglect. Thus, the order could not have been more narrowly tailored.

(2) Failure to Provide an Administrative Hearing

The facility complains that AHCA erred by not providing an administrative hearing and that we should overturn the order and remand for such a hearing. There is no requirement that a hearing be held prior to the issuance of an emergency order. The question of whether AHCA was required to provide a post-order hearing is not properly before this court. The record does not reflect that the facility requested such a hearing. We, therefore, decline to rule on this issue because it was not properly preserved. *See Rosenzweig v. Dep't of Transp.*, 979 So. 2d 1050, 1052 (Fla. 1st DCA 2008) ("[A]ppellants waived their right to go to a formal hearing . . . by not requesting a formal hearing at any time.")

In its reply brief, the facility argues for the first time that the text of the final order was required to provide notice of the right to an administrative hearing, and the lack of this notice

rendered the order facially insufficient. We decline to address issues raised for the first time in the reply brief. *See Parker-Cyrus v. Justice Admin. Comm'n*, 160 So. 3d 926, 928 (Fla. 1st DCA 2015) (citing *United Auto Ins. Co. v. Hollywood Injury Rehab. Ctr.*, 27 So. 3d 743, 744 n.1 (Fla. 4th DCA 2010) ("[I]ssues raised for the first time in the reply during certiorari proceedings will not be considered."); *Land v. Fla. Dep't of Corr.*, 181 So. 3d 1252, 1254 (Fla. 1st DCA 2015) ("'An issue not raised in an initial brief is deemed abandoned and may not be raised for the first time in a reply brief.'" (quoting *Hoskins v. State*, 75 So. 3d 250, 257 (Fla. 2011))). Thus, we affirm the ISFO.

### C. Emergency Suspension Order

The facility also argues that the Emergency Suspension Order, which suspended its license to operate, was facially insufficient. This argument is without merit.

The Emergency Suspension Order contained significantly more detailed factual allegations than the first two orders. It included facts alleging a causal connection between the heat and the patients' deaths. Four of the residents died soon after being admitted to the hospital with body temperatures between 107 and 109.9 degrees. However, staff members went back and created "late entry" notes reflecting that the patients had relatively normal body temperatures at a time when they were already dead or dying at the hospital.

This order also expressly alleged deficient conduct by staff, specifically, a failure to monitor patients and a failure to timely call 911 and evacuate the facility:

> [The facility] knew or should have known the danger presented to residents in its physical plant, yet failed to monitor, care for, and protect its residents. [The facility's] sole identified response was to belatedly call '911' on an individual basis as its residents suffered, one after another, cardiac or respiratory arrest. In addition, [the facility] was located across the street from a large, air-conditioned public hospital. This hospital was fully functional during the relevant period, yet [the facility] failed to transfer its residents to that large, air-

13

conditioned public hospital, or any other appropriate placement, in a timely fashion.

This order also contained specific reasons for concluding that the danger to residents would not end when the power was restored and that suspension was necessary. AHCA concluded that "this facility's administrator and medical professionals did not know to call '911' in an ongoing emergency. As such, this facility presents a danger to every person on its premises." Thus, the suspension of the facility's license was necessary to protect the residents from "unsafe conditions and deficient practices."

Contrary to the facility's argument, AHCA alleged this conduct violated the law. Specifically, it violated section 400.141(1)(h), Florida Statutes, which requires facilities to operate the premises "in a safe and sanitary manner," and section 400.102(1), Florida Statutes, which states AHCA may take action against a license in the event of "[a]n intentional or negligent act materially affecting the health or safety of residents of the facility."

These allegations are more than sufficient. The order did not merely allege a single lapse in judgment, but instead a failure to act towards multiple patients over the course of many hours, which led AHCA to conclude the staff did not know to call 911 in an emergency. Thus, this order contained sufficiently detailed allegations of an immediate serious danger that was likely to continue without the suspension, which could not have been more narrowly tailored. *See* § 120.60(6)(c), Fla. Stat.; *Sanchez v. Dep't of Health*, 225 So. 3d 964, 966 (Fla. 1st DCA 2017); *Preferred RV, Inc. v. Dep't of Highway Safety & Motor Vehicles*, 869 So. 2d 713, 714 (Fla. 1st DCA 2004). As such, the order was facially sufficient.

The order in case number 1D17-3858 is AFFIRMED. The petitions for writ of certiorari in case numbers 1D17-3883 and 1D17-4092 are DENIED.

ROBERTS and WETHERELL, JJ., concur.

14

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____


Geoffrey D. Smith, Timothy B. Elliott, and Corinne T. Porcher of Smith & Associates, Tallahassee, for Appellant/Petitioner.

Stephen A. Ecenia, J. Stephen Menton, Tana D. Storey, Craig D. Miller, and Gabriel F. V. Warren of Rutledge Ecenia, P.A., Tallahassee, for Appellee/Respondent.

William Roberts, Deputy General Counsel, and Tracy C. George, Chief Appellate Counsel, Agency for Health Care Administration, Tallahassee, for Respondent.